**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| KAREN BALICKI, an individual, on her own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE SAVINGS GROUP, INC., a Delaware corporation, and RATEGENIUS LOAN SERVICES, INC., a Texas corporation,<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | No. 1:26-cv-3148 |

## CLASS ACTION COMPLAINT

Plaintiff Karen Balicki ("Balicki" or "Plaintiff") brings this class action complaint against Defendants The Savings Group, Inc. ("TSG" or "Savings") and RateGenius Loan Services, Inc. ("RateGenius" or "RGLS," and together with TSG, "Defendants"), to stop Defendants' practice of unsolicited telemarketing texts and calls to loan applicants after loan applicants have told Defendants to stop telemarketing them, and to obtain redress for all persons injured by this conduct. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by her attorneys.

## Nature of the Case

1. Plaintiff, individually and as proposed class representative for all others similarly situated, brings this action against Defendants for violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227 ("TCPA") and the Florida Telephone Solicitation Act, Fla. Stat. § 501.059 ("FTSA") for unsolicited, telemarketing calls made by or on behalf of Defendants, and

for violating the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f ("ECOA") and its implementing Regulation B (12 C.F.R. Part 1002) by denying prospective borrowers' credit applications without providing a timely adverse action notice that complied with ECOA.

2. Plaintiff, individually, and on behalf of the class members, seeks an injunction and other equitable relief, and an award of statutory damages, costs, and reasonable attorneys' fees, to the members of the proposed classes.

## Parties

3. Plaintiff Karen Balicki is a natural person and a resident of Florida. She is the subscriber of a residential telephone listed on the national Do Not Call ("DNC") list, on which she received numerous unsolicited telephone calls from Defendants.

4. The Savings Group, Inc. is a Delaware corporation. On information and belief, The Savings Group, Inc. maintains an office at 9300 United Drive, Suite 180, Austin, Texas 78758, but it does not maintain a registration with the Texas Secretary of State. On information and belief, The Savings Group, Inc. directs the telemarketing alleged below from its office at 8055 East Tufts Avenue, Suite 1100, Denver, Colorado 80237 (the "Telemarketing Office").

5. RateGenius Loan Services, Inc. is a Texas corporation, which lists its address with the Texas Secretary of State as 9300 United Drive, Suite 180, Austin, Texas 78758.

6. RGLS is a nationwide vehicle refinance platform that connects consumers with lending partners. TSG is the parent company of RateGenius. On information and belief, TSG supplies RateGenius's office space, IT infrastructure (including its email server, website, and text messaging platform), and management, and controls the practices alleged herein through their joint management (including co-CEOs Jeffrey Hutcheson and Curtis Seth Meyers). RGLS and TSG jointly control and operate the email server, website, and text messaging platform

referenced below.

7. Plaintiff alleges Defendants acted in concert and as a joint enterprise at all times relevant to this matter.

**Jurisdiction and Venue**

8. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants district courts original jurisdiction on all civil actions arising under the laws of the United States. *See Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 386-87 (2012) (confirming that 28 U.S.C. § 1331 grants the United States District Courts federal-question subject-matter jurisdiction to hear private civil suits under the TCPA).

9. Moreover, the Court has diversity jurisdiction. Balicki is a citizen of Florida. RGLS is a citizen of Texas. TSG is a citizen of Delaware and Colorado. This Complaint alleges claims on behalf of a proposed class whose members include persons residing outside Delaware, Colorado, and Texas, and who are not citizens of the same states as the Defendants (such as Balicki). The members of the proposed class are diverse from the Defendants. Balicki alleges, on information and belief, the aggregate of the amount in controversy in these class claims exceeds the sum or value of $5 million and the total number of class members exceeds 100. This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).

10. In addition, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims brought under state law (FTSA) because this claim is so related to the TCPA and ECOA claims that they form part of the same case or controversy under Article III of the United States Constitution.

11. This Court has personal jurisdiction over the Defendants under Texas Civil Practice & Remedies Code § 17.042 because RGLS resides in this District, and because

Defendants committed a tort in this state by continuing to call and text recipients after the recipients revoked consent to such telemarketing while within Texas.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because RGLS resides in this District, and because a substantial part of the events giving rise to the claim occurred in this District.

**The Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227**

13. "Americans passionately disagree about many things. But they are largely united in their disdain for robocalls." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2343 (2020).

14. In 1991, Congress enacted the TCPA, in response to a growing number of consumer complaints regarding certain telemarketing practices. Pub. L. No. 102-243, (Dec. 20, 1991), *codified at* 47 U.S.C. § 227. *See also Mims*, 565 U.S. at 371 ("The Act bans certain practices invasive of privacy").

15. The TCPA (via its implementing FCC regulations) prohibits telemarketing calls unless the caller "has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d); *see also* 47 U.S.C. § 227(c)(5). These procedures must, at a minimum, ensure that if a person requests that the caller stop calling them, the caller must record the request and place the person's telephone number on the caller's do-not-call list and "must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made" not to exceed ten days. 47 C.F.R. § 64.1200(d)(3). The TCPA provides a private right of action for damages and injunctive relief for such DNC violations. 47 U.S.C. § 227(c)(5).

16. Defendants are liable under the TCPA. The FCC's regulations "generally

establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In the Matter of Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 10 FCC Rcd. 12391, 12397, ¶13 (1995). The FCC reiterated this principle in 2013, when it explained that "a seller . . . may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 FCC Rcd. 6574, 6574 (2013). "Vicarious liability under the TCPA is governed by the federal common law of agency." *Callier v. Wide Merch. Inv., Inc.*, 671 F. Supp. 3d 736, 743 (W.D. Tex. 2023). *Cf. id.* at 746 (describing TCPA liability for ratification, where Defendants "knowingly accepted the benefits that flowed from the call campaign in the form of increased business"). *See also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 168 (2016) ("no cause to question" precept that "under federal common-law principles of agency, there is vicarious liability for TCPA violations"); Restatement (Third) of Agency (2006) §§ 2.01, 2.03, 4.01 (vicarious liability "may be established by express authorization, implicit authorization, or ratification").

17. The TCPA reflects Congress's intent to preserve the social norms that Americans answer calls to their telephone numbers. Abusive telemarketing like that used by Defendants is a scourge on modern society, and represents an increasing threat to Americans' continued use of the telephone system, which relies on the custom that people generally answer telephone calls to their telephone number. The TCPA's legislative history recognized that the continued proliferation of telemarketing, left unchecked, would undermine that custom. "Unwanted calls are tainting the wanted ones and make us cringe at the thought of answering the telephone at night. [] [I]t's a classic case of the bad apples spoiling the whole barrel." 137 Cong. Rec. H11,312 (daily ed. Nov. 26, 1991) (statement of Rep. Cooper); 137 Cong. Rec. H11,310 (daily

ed. Nov. 26, 1991) (statement of Rep. Markey) (TCPA intended to protect privacy "before our home telephones become the receptacles of junk calls in the same way that junk mail often inundates our mailboxes"). The situation has greatly worsened since the TCPA was first passed. Unless the situation improves, Americans will permanently acclimate to the telephone call as a fundamentally untrustworthy medium for free speech and stop answering unidentified telephone calls, frustrating the legislative intent behind the TCPA.

**Equal Credit Opportunity Act, 15 U.S.C. §§ 1691-1691f**

18. ECOA provides a private right of action to aggrieved applicants against "[a]ny creditor who fails to comply with any requirement imposed under this subchapter" for actual damages, punitive damages, equitable and declaratory relief, and a reasonable attorney's fee. 15 U.S.C. § 1691(a), (b), (c), (d).

19. Defendants are "creditors" under ECOA because they "regularly extend[] credit," "regularly arrange[] for the extension [] of credit," and/or "in the ordinary course of business, regularly participate[] in a credit decision, including setting the terms of the credit." 15 U.S.C. § 1691a(e); 12 C.F.R. § 1002.2(l).

20. ECOA authorizes the Bureau of Consumer Financial Protection to "prescribe regulations to carry out [ECOA's] purposes." 15 U.S.C. § 1691b(a). ECOA and its implementing regulation (Regulation B, 12 C.F.R. Part 1002) provide applicants a right to a statement of reasons for any adverse action on a loan application. "Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(a)(1).

21. Where a creditor takes an adverse action against an applicant, ECOA and Regulation B require the creditor to provide the applicant with a written statement of the specific

reasons for such adverse action "[w]ithin thirty days after receipt of a completed application for credit." 15 U.S.C. § 1691(d)(1). *See also* 15 U.S.C. § 1691(d)(2), (3); 12 C.F.R. § 1002.9(a)(1). In the alternative, Regulation B requires creditors to provide applicants whose applications are incomplete with notice that their application is incomplete. 12 C.F.R. § 1002.9(a)(1)(ii), (c).

22. Congress amended ECOA in 1976 to require creditors to provide applicants with written notice of the specific reasons why creditors took adverse action on credit decisions with respect to the applicants.

> Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor. A creditor satisfies this obligation by—
>
> (A) ***providing statements of reasons in writing as a matter of course to applicants against whom adverse action is taken***; or
>
> (B) giving written notification of adverse action which discloses (i) the applicant's right to a statement of reasons within thirty days after receipt by the creditor of a request made within sixty days after such notification, and (ii) the identity of the person or office from which such statement may be obtained. Such statement may be given orally if the written notification advises the applicant of his right to have the statement of reasons confirmed in writing on written request.

15 U.S.C. § 1691(d)(2) (emphasis added).

23. ECOA's notice requirements are an essential complement to its anti-discrimination provision. Adverse action notices provide information that is an essential tool for detecting potential discrimination—but also finding potential mistakes in creditors' records, and informing rejected credit applicants about how they can improve their credit.

> [T]his information should have a pervasive and valuable educational benefit. Instead of being told only that they do not meet a particular creditor's standards, consumers particularly should benefit from knowing, for example, that the reason for the denial is their short residence in the area, or their recent change of employment, or their already over-extended financial situation.

S. Rep. No. 94-589 (1976), reprinted in 1976 U.S.C.C.A.N. at 403, 406.

**Defendants' Illegal Telemarketing**

24. TSG and RGLS use telemarketing to solicit auto loan refinancing through aggressive outbound telemarketing campaigns, and continue to make telemarketing calls and send telemarketing texts after the recipients have told them to stop.

25. TSG and RGLS use these illegal telemarketing campaigns to solicit consumers to refinance their car loans via RGLS. TSG and RGLS derive income from refinancing auto loans procured through this telemarketing, so these telemarketing campaigns are conducted for their benefit and on their behalf. TSG directs this telemarketing from its Telemarketing Office in Denver. TSG and RGLS made, and continue to make, these telemarketing calls to individuals nationwide without their consent. Defendants have knowingly and actively accepted money generated by illegal telemarketing calls and texts.

26. On information and belief, TSG and RGLS and the telemarketers used for the telemarketing campaigns alleged in this complaint were and are at all relevant times Defendants' employees, actual agents, ostensible agents, conspirators, partners, alter egos, joint venturers, and/or employees, and the acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of Defendants.

27. On information and belief, Plaintiff alleges Defendants systematically and routinely fail to provide written adverse action notifications that comply with ECOA and Regulation B. See 15 U.S.C. § 1691(d)(2); 12 C.F.R. §§ 1002.9(a)(2), (b).

**Plaintiff's Individual Allegations**

28. **Balicki's DNC Number:** At all times relevant to this complaint, Balicki's telephone number (the "Number") has been used for personal, family, and household purposes:

this is a residential number.

29. **Balicki Makes a Credit Application:** In early August 2026, Balicki began searching to refinance her car loan. Balicki used Credit Karma's website at www.creditkarma.com to look for potential lenders: she gave Credit Karma basic information about herself (including her Number), her car and her car loan. Credit Karma then provided a list of several potential lenders, including RateGenius and one of its affiliates, which displayed pre-populated terms of prospective loans for each such lender.

30. When Balicki clicked on the RateGenius link on www.creditkarma.com, it redirected her browser to a page on RateGenius's website. Balicki transmitted a pre-populated form on that page (including the total pay-off of her existing car loan), and later received an email from RateGenius and follow-up texts and telephone calls from RateGenius.

31. On information and belief, Defendants routinely accept credit applications through RateGenius's website, including via the specific purchase flow originating with Credit Karma used by Balicki. By submitting the form and participating in the subsequent follow-up communications, Balicki made a credit application under ECOA and Regulation B: a "request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 1002.2(e). *See* 12 C.F.R. pt. 1002, Supp. I, cmt. 2(f) ¶¶3-5. Balicki was an "applicant" under Regulation B because she requested an extension of credit from Defendants. 12 C.F.R. § 1002.2(f).

32. **Defendants Deny Balicki's Credit Application:** On or about August 6, 2026, Defendants rejected Balicki's credit application. Defendants sent Balicki a proposed refinance agreement with a higher loan balance than what she requested—or needed. Defendants' proposed refinance agreement would have resulted in Balicki paying over $4,000 ***more*** for her

car than her current loan.

33. Defendants' decision not to refinance Balicki's car on the terms she requested was an "adverse action" under ECOA, because she did not accept Defendants' counteroffer. 12 CFR § 1002.2(c)(1)(i) ("refusal to grant credit in substantially the amount or on substantially the terms requested in an application unless the creditor makes a counteroffer (to grant credit in a different amount or on other terms) and the applicant uses or expressly accepts the credit offered"). *See also* 15 U.S.C. § 1691(d)(6).

34. Defendants never ultimately provided any explanation why their loan agreement had increased Balicki's debt on refinancing by over $4,000. *Cf.* 15 U.S.C. § 1691(d)(3) ("statement of reasons [for adverse action complies with ECOA] only if it contains the specific reasons for the adverse action taken").

35. **Balicki Revokes Consent to Telemarketing:** Balicki responded with a screenshot showing that the total payoff on her car loan was lower than the number RGLS had provided her. On August 7, 2026 at 12:44pm, Balicki sent a text (the "Cancellation Text") which stated "Cancel. I decline the refinance."

36. **Defendants Continue to Telemarket to Balicki:** Despite Balicki's clear Cancellation Text, at 5:17pm, Defendants' employee left a voicemail on Balicki's Number, then sent a text that continued to solicit Balicki: "Hi Karen, called earlier and left a message. Did you get it?" Balicki promptly responded "Stop" (the "Stop Text"). Defendants' automated text messaging system sent a message confirming she had revoked Defendants' consent to contact, which stated: "You will no longer receive messages from RGLS. To opt back in at any time reply START" (the "Confirmation Text").

37. After the Confirmation Text, Defendants sent at least three more texts to the

Number and called her Number at least twice from (720) 439-9356 or (720) 734-2861. The 720 area code indicates these telemarketing communications were sent from TSG's Telemarketing Office. All of these communications sought to refinance Balicki's car loan under terms which Balicki had previously made clear to Defendants were unacceptable.

38. **Balicki's Injuries:** Defendants' unsolicited calls caused Plaintiff harm. In addition to using the cellular data, storage, and battery life of the phone associated with the Number, Balicki suffered invasion of privacy, aggravation, annoyance, frustration, distraction, forced diversion of her attention away from her work, home life and other activities, inconvenience, wasted time, risk of future harm, and violation of her substantive rights under the TCPA to remain free of unsolicited calls.

39. Defendants' failure to provide a written statement concerning its adverse action constituted an informational injury. Balicki was entitled to that information, and the basis for Defendants' adverse action was relevant to Balicki because of her interest in a better, less expensive car loan, in the information needed to make her loan application complete, and/or in the basis for Defendants' increased pay-off amount, as well as her interest in the underlying enforcement of ECOA and the TCPA.

40. **Defendants' Telemarketing Campaigns:** TSG knew that RGLS continued to telemarket refinancing to credit applicants after they had revoked consent for RGLS to contact them. TSG controlled the manner and means by which the scheme was accomplished through interim instructions from its Telemarketing Office. On information and belief, TSG (1) gave frequent feedback to RGLS before, during, and after refinancing car loans generated by the telemarketing; (2) had access to or controlled call records for the telemarketing; and (3) had the ability to collect text messages and audio recordings of RGLS's outgoing calls on demand, and

routinely reviewed such recordings.

41. On information and belief, TSG ratified Defendants' TCPA violations by accepting the profits from the car loans RGLS generated by these telemarketing campaigns, while willfully ignoring evidence that Defendants' telemarketing calls violated the law.

## Class Action Allegations

42. **Class Definitions:** Plaintiff brings this Complaint against Defendants, pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and the following Classes:

**The DNC Class:**
All persons in the United States who received two or more telemarketing calls or texts to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants after revoking consent, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

**The Florida DNC Class:**
All persons in Florida who received two or more telemarketing calls or texts to their cellular or residential telephone numbers within any 12-month period by or on behalf of Defendants after revoking consent, from four years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

**The ECOA Class:**
All consumers located in the United States (1) who applied for a new or refinanced loan with Defendants; (2) where Defendants did not grant such loan in substantially the amount or on substantially the terms requested; and (3) who did not receive any other written statement of reasons for such denial of their loan application and/or notice their loan application was incomplete within 30 days of the application, and from five years prior to the date of Plaintiff's original complaint through the date the Court certifies the class.

Excluded from the Classes are any entity in which Defendants have a controlling interest or which has a controlling interest in Defendants, and any such entities' owners, affiliates, agents, legal representatives, predecessors, successors, assigns, and employees, the judge and staff to whom this case is assigned, and any member of the judge's immediate family. Plaintiff reserves the right to revise and amend this class definition based on facts learned during discovery.

43. **Numerosity:** The exact number of members of the Classes is unknown and is not available to Plaintiff at this time, but such information is readily ascertainable from Defendants and their agents' records. Given the size of Defendants' business, the Class members number at least in the hundreds. The Classes are so numerous that joinder of all members is impractical. Plaintiff alleges that there are at least forty members of each Class.

44. **Commonality:** Plaintiff and the members of the Classes share common experiences receiving calls by or on behalf of Defendants. They received multiple, incessant, uninvited calls and texts for the purposes of soliciting consumers to refinance their car loans, and/or had their credit applications rejected without adequate disclosure of the reasons why.

45. **Predominance:** In addition, common questions of fact and law exist as to all Class members and predominate over the questions affecting only individual members of the Classes. Identification of the individuals who qualify as a member of a Class will be sufficient to establish liability to the class member. The predominant common questions include:

a. Whether Defendants and/or their agents made telephone calls to members of the DNC Class whose telephone numbers were registered with the national Do-Not-Call registry, and/or instituted and maintained procedures and minimum standards prescribed by 47 C.F.R. § 64.1200(d) for making telemarketing calls;

b. Whether Defendants had legally effective consent to place telemarketing calls to Plaintiff and Class members;

c. Whether Defendants routinely denied loan applications without providing written adverse action notifications including a statement of reasons why;

d. Whether Plaintiff and Class members are entitled to damages, including whether Defendants' violations were performed willfully or knowingly such that Plaintiff and Class members are entitled to treble damages;

e. Whether Plaintiff and Class members are entitled to injunctive relief and attorneys' fees and costs.

46. **Typicality:** Plaintiff's claims are typical of the claims of the other members of the

Classes. Plaintiff is not different in any relevant way from any other members of the Classes, and the relief she seeks is common to the Classes.

47. **Adequate Representation:** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes: Plaintiff's interests do not conflict with the interests of the other Class members. Plaintiff has retained counsel competent and experienced in complex class actions, including class actions arising under the TCPA and other consumer protection laws, and they intend to prosecute this action vigorously.

48. **Predominance and Superiority:** The Classes alleged in this Complaint are appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. The damages suffered by each individual Class member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. It would be virtually impossible for Class members to individually obtain effective relief from Defendants' misconduct. Even if Class members themselves could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, class actions present far fewer management difficulties and provide the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

49. **Generally Applicable Policies:** This class action is also appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief

with respect to each class as a whole. The policies of the Defendants challenged herein apply and affect members of each class uniformly, and Plaintiff's challenge of these policies hinges on Defendants' conduct, not on facts or law applicable only to Plaintiff.

50. **Injunctive Relief is Appropriate:** Based on information and belief, Defendants continue to engage in the improper practices discussed above. Injunctive relief is necessary and appropriate to enjoin Defendants' conduct and to prevent irreparable harm to Plaintiff and the members of the Classes for which they have no adequate remedy at law.

## FIRST CAUSE OF ACTION
### (Violation of 47 U.S.C. § 227(c)(5) and/or 47 C.F.R. § 64.1200(d) Against All Defendants By Plaintiff, Individually, and on Behalf of the DNC Class)

51. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

52. Defendants are "persons" as defined by 47 U.S.C. § 153(39).

53. The TCPA provides that any "person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may" bring an action for injunctive relief and statutory damages of $500 per violation. 47 U.S.C. § 227(c)(5). Where "the court finds that the Defendants willfully or knowingly violated the regulations prescribed under this subsection," it "may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount [otherwise] available . . ." *Id.*

54. The FCC's TCPA regulation provides that

> No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:

> (1) Written policy. Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
>
> (2) Training of personnel engaged in telemarketing. Personnel engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
>
> (3) Recording, disclosure of do-not-call requests. If a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made [and] ***must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made***. . . .
>
> (4) Identification of sellers and telemarketers. A person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges.

47 C.F.R. § 64.1200(d). Again, this prohibition also applies to wireless telephone numbers. 47 C.F.R. § 64.1200(e).

55. On information and belief, Defendants and/or their agents violated 47 C.F.R. § 64.1200(d) by making telephone calls and sending texts for telemarketing purposes because they did not record and honor do-not-call requests and/or were not trained to do so. Defendants' violations are willful because Defendants knew (or deliberately and willfully avoided knowing) that the TCPA prohibited such conduct. Because Defendants' violations were willful, the Court should treble the amount of statutory damages.

56. Plaintiff Karen Balicki, on her own behalf, and on behalf of the other DNC Class members, seeks to recover statutory damages (including treble damages for willful violation of

the TCPA), as well as injunctive and equitable relief under 47 U.S.C. § 227(c)(5) against Defendants.

**SECOND CAUSE OF ACTION**
**(Violation of Fla. Stat. § 501.059 Against All Defendants By Plaintiff, Individually, and on Behalf of the Florida Class)**

57. Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

58. FTSA prohibits initiating

> an outbound telephone call, text message, or voicemail transmission to a consumer, business, or donor or potential donor who has previously communicated to the telephone solicitor or other person that he or she does not wish to receive an outbound telephone call, text message, or voicemail transmission
>
> Made by or on behalf of the seller whose goods or services are being offered

Fla. Stat. § 501.059(5).

59. "A called party who is aggrieved by a violation of [FTSA] may bring an action to: 1. Enjoin such violation; [and] 2. Recover actual damages or $500, whichever is greater." Fla. Stat. § 501.059(10)(a). FTSA also authorizes treble damages if the court "finds that the defendant willfully or knowingly violated" FTSA. Fla. Stat. § 501.059(10)(a). FTSA also provides a prevailing plaintiff may recover "reasonable attorney fees and costs." Fla. Stat. § 501.059(11).

60. On information and belief, Defendants and/or their agents violated Fla. Stat. § 501.059(5) by making telephone calls and sending texts for telemarketing purposes after Balicki and the other Florida Class members communicated to Defendants that they did not wish to receive Defendants' telephone calls or text messages. Defendants' violations are willful because Defendants knew (or deliberately and willfully avoided knowing) that the FTSA prohibited such

conduct. Because Defendants' violations were willful, the Court should treble the amount of statutory damages.

61. Plaintiff, on her own behalf, and on behalf of the other Florida Class members, seeks to recover statutory damages (including treble damages for willful violation of the FTSA), as well as injunctive and equitable relief under Fla. Stat. § 501.059(10)(a) against Defendants.

**THIRD CAUSE OF ACTION**
**(Violation of 15 U.S.C. § 1691 Against All Defendants**
**By Plaintiff, Individually, and on Behalf of the ECOA Class)**

62. Plaintiff incorporates by reference and realleges all paragraphs previously alleged herein.

63. Defendants are "creditors" under 15 U.S.C. § 1691a(e) and 12 C.F.R. § 1002.2(l).

64. Plaintiff and the other ECOA Class Members are "applicants" under 12 C.F.R. § 1002.2(e) because they requested an extension of credit from Defendants, in accordance with Defendants' procedures.

65. ECOA provides applicants a right to a written statement of reasons for any adverse action on a loan application. "Each applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2); 12 C.F.R. § 1002.9(a)(1). In the alternative, Regulation B also requires creditors to provide applicants whose applications are incomplete with notice that their application is incomplete. 12 C.F.R. § 1002.9(a)(1)(ii), (c).

66. Defendants refused to grant credit to Plaintiff and the ECOA Class in substantially the amount or on substantially the terms requested. Defendants' conduct constitutes an "adverse action" under 15 U.S.C. § 1691(d)(6). "The statement of reasons for adverse action required by [ECOA] must be specific and indicate the principal reason(s) for the adverse action."

12 C.F.R. § 1002.9(b)(2).

67. In addition or the alternative, Defendants failed to provide the Plaintiff and the ECOA Class with written notice that their loan applications were incomplete. 12 C.F.R. § 1002.9(a)(1)(ii), (c). In response to an incomplete application, Regulation B requires creditors to provide

> written notice to the applicant specifying the information needed, designating a reasonable period of time for the applicant to provide the information, and informing the applicant that failure to provide the information requested will result in no further consideration being given to the application.

12 C.F.R. § 1002.9(a)(1)(c).

68. Defendants' violations of 15 U.S.C. § 1691(d)(3) and 12 C.F.R. § 1002.9 arise, in part, from the fundamental weaknesses in Defendants' underwriting standards, evidenced in the allegations above. ECOA Class members may seek credit from Defendants again at some point in the future, and they risk exposure to future ECOA violations because of these weaknesses. Plaintiff lacks adequate remedies at law to address these weaknesses.

69. Plaintiff, on her own behalf, and on behalf of the other class members, seeks to recover damages from Defendants for their ECOA violations, in an amount to be determined at trial, equitable and declaratory relief, and the costs of the action, together with reasonable attorney's fees as determined by the Court under 15 U.S.C. § 1691e(b), (d).

**WHEREFORE,** Plaintiff prays that the Court enter judgment and orders in Plaintiff's favor and against Defendants The Savings Group and RateGenius Loan Services, Inc. as follows:

a. An order certifying the Classes, directing that this case proceed as a class action, and appointing Plaintiff and her counsel to represent the Classes;

b. Statutory damages as provided under 47 U.S.C. § 227(c)(5) against Defendants in favor of Plaintiff and the DNC Class, including trebled damages for willful and knowing violations;

c. Statutory damages as provided under Fla. Stat. § 501.059(10)(a) against Defendants in favor of Plaintiff and the Florida Class, including trebled damages for willful and knowing violations;

d. Punitive damages as provided under 15 U.S.C. § 1691e(b) against Defendants in favor of Plaintiff and the ECOA Class;

e. Reasonable and necessary attorneys' fees as provided under Fla. Stat. § 501.059(11) against Defendants in favor of Plaintiff and the Florida Class;

f. Reasonable attorneys' fees and the costs of the action as provided under 15 U.S.C. § 1691e(d) against Defendants in favor of Plaintiff and the ECOA Class;

g. Injunctive relief under 47 U.S.C. § 227(c)(5), Fla. Stat. § 501.059(10)(a), and 15 U.S.C. § 1691e(b) against Defendants in favor of Plaintiff and the Classes;

h. Such other and further relief as this Court may deem appropriate.

Dated: November 11, 2026 By: s/Ethan Preston

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

Scott D. Owens (pending pro hac vice admission)
scott@scottdowens.com
SCOTT D. OWENS, P.A.
2750 North 29th Avenue, Suite 209A
Hollywood, FL 33020
Telephone: (954) 589-0588
Facsimile: (954) 337-0666

*Attorneys for Plaintiff Karen Balicki, on her own behalf, and on behalf of all others similarly situated*

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: November 11, 2026

By: s/Ethan Preston

Ethan Preston (24091084)
ep@eplaw.us
PRESTON LAW OFFICES
4054 McKinney Avenue, Suite 310
Dallas, Texas 75204
Telephone: (972) 564-8340
Facsimile: (866) 509-1197

*Attorneys for Plaintiff Karen Balicki, on her own behalf, and on behalf of all others similarly situated*